Arris Grp., Inc. v. CyberPower Sys. (USA), Inc., 2017 NCBC 57.

STATE OF NORTH CAROLINA

DURHAM COUNTY

ARRIS GROUP, INC.,

        Plaintiff,

v.

CYBERPOWER SYSTEMS (USA),
INC., *et al.*,

        Defendants,

and

DELTA PRODUCTS
CORPORATION,

        Respondent.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 4050

**ORDER AND OPINION ON
MOTION TO COMPEL**

1. This ancillary proceeding requires the Court to determine whether Respondent Delta Products Corporation ("Delta") must search for and produce documents for use in an Illinois lawsuit between ARRIS Group, Inc. ("ARRIS") and CyberPower Systems (USA) Inc. ("CyberPower"). Delta, which is not a party to that litigation, appears in this proceeding only because CyberPower has moved to compel ("Motion") Delta to respond to a *subpoena duces tecum* served in North Carolina. The Court, after reviewing the Motion, the briefs supporting and opposing the Motion, and the parties' arguments at the hearing on June 14, 2017, **GRANTS in part** and **DENIES in part** CyberPower's Motion.

*Kennon Craver, PLLC by Joel M. Craig, and Williams, Bax & Saltzman, P.C. by Douglas W. Bax, for Defendants.*

*Womble Carlyle Sandridge & Rice, LLP by David R. Boaz, and Pepper Hamilton LLP by Thomas F. Fitzpatrick, for Respondent.*

Conrad, Judge.

I.
BACKGROUND

A. The Illinois Litigation

2.     The Illinois litigation concerns modules used as part of Verizon Communications, Inc.'s ("Verizon") fiber optic service, or FiOS, for internet, telephone, and television. (CyberPower Systems USA's Mem. of Law in Supp. of Its Am. and Restated Mot. to Compel Delta Products Corp. to Comply with Subpoena Duces Tecum 4 ["CyberPower Mem."].)  Each FiOS module consists of two components: an optical network terminal and a power supply. (CyberPower Mem. Ex. 1 ¶¶ 23–24.)  The optical network terminal "converts a fiber optic signal into usable TV, internet, and phone services." (CyberPower Mem. 4; *see also* CyberPower Mem. Ex. 1 ¶ 23.)  The power supply "plugs into the home's wall-outlet" to provide power for the optical network terminal and also includes a battery backup component, which provides power "in the event of a power outage." (CyberPower Mem. 4; *see also* CyberPower Mem. Ex. 1 ¶ 24.)

3.     ARRIS manufactures FiOS modules by making the optical network terminals and pairing them with power supplies provided by a vendor. (CyberPower Mem. 4, Ex. 1 ¶ 13.)  ARRIS sells the completed modules to Verizon, which then installs the modules in the homes of its customers. (CyberPower Mem. 4.)

4. In 2006, Verizon received reports of malfunctioning power supplies. (CyberPower Mem. 4.) Verizon asked ARRIS and other module manufacturers to identify partners to develop new, replacement power supplies. (CyberPower Mem. 4–5.) ARRIS initially selected Delta as a vendor, and at least one other manufacturer selected CyberPower. (CyberPower Mem. 5.) In 2006, Verizon approved CyberPower's power supplies, and in 2007 ARRIS began purchasing them instead of Delta's. (CyberPower Mem. 5.)

5. In 2012, ARRIS determined that CyberPower's power supplies were failing prematurely. (CyberPower Mem. 5.) According to ARRIS, the battery backup components had a design defect: certain capacitors overheated when used in Verizon's specified operating conditions, causing them to degrade prematurely. (CyberPower Mem. 5–6, Ex. 1 ¶ 37.) As a result, ARRIS ended its relationship with CyberPower and began purchasing power supplies from Delta. (CyberPower Mem. 5.)

6. In 2013, ARRIS sued CyberPower in Illinois, asserting claims for breach of express and implied warranties. ARRIS alleges that CyberPower provided power supplies with battery backup components that failed "to conform to product specifications, express contractual requirements, and express and implied warranties." (CyberPower Mem. Ex. 1 ¶ 1.)

B. The North Carolina Subpoena

7. In August 2016, CyberPower served Delta—a nonparty—with a subpoena in North Carolina. CyberPower sought a wide range of documents and communications related to the design, development, and testing of Delta's power

supplies. (*See* CyberPower Mem. Ex. 2.) Delta refused to produce documents and objected that the requests were overbroad, unduly burdensome, and called for the production of trade secrets and confidential information to a direct competitor. (*See* CyberPower Mem. Ex. 3.)

8. After discussions between counsel, CyberPower revised the subpoena. (CyberPower Mem. Ex. 4.) The revised subpoena includes nine requests for production, with no defined time period, that break down into four categories:

   a. The agreement between ARRIS and Delta for the sale of power supplies or battery backup components.

   b. All specifications for Delta's power supplies or battery backup components.

   c. All communications with ARRIS or Verizon regarding actual or anticipated operating conditions for the power supplies; testing or analysis of the temperature levels of the power supplies and any component parts; and the expected or actual operating life of the power supplies.

   d. All documents relating to the determination, calculation, or analysis of the operating life of the power supplies.

(*See* CyberPower Mem. Ex 4; *see also* CyberPower Mem. 10.)

9. Although the revised requests were more limited in scope than the original subpoena, Delta maintained its objections. CyberPower filed a motion to compel in Durham County in November 2016. A few months later, CyberPower abandoned this motion in favor of filing a motion to compel ARRIS to produce a similar set of

documents in the Illinois litigation.  (CyberPower Mem. Exs. 8, 9.)  In February 2017, the Illinois court issued an order compelling ARRIS to provide the responsive documents in its possession, custody, or control.  (CyberPower Mem. Ex. 10.)  ARRIS produced some documents but represented that, due to standard document retention procedures, it had not retained other documents related to Delta's power supplies. (*See* CyberPower Mem. 14.)

10.  Believing that it had exhausted alternative avenues for obtaining the requested information, CyberPower renewed its demand that Delta respond to the revised subpoena.  Delta refused, and CyberPower filed the Motion on April 26, 2017. The proceeding was designated as a mandatory complex business case on May 18, 2017, assigned on May 22, 2017, and is now fully briefed and ripe for determination.

II.
ANALYSIS

11.  The decision to grant or deny a motion to compel discovery lies within the "sound discretion" of the trial court.  *Sessions v. Sloane*, 789 S.E.2d 844, 853–54 (N.C. Ct. App. 2016) (quoting *Patrick v. Wake Cnty. Dep't of Human Servs.*, 188 N.C. App. 592, 595, 655 S.E.2d 920, 923 (2008)).  Here, the issue is whether a nonparty (Delta) must search for and produce documents, including trade secret and confidential information, to its direct competitor (CyberPower) for use in out-of-state litigation.

A.  Legal Standard

12.  The North Carolina Rules of Civil Procedure contemplate and permit discovery as to nonparties.  A foreign litigant, such as CyberPower, may serve a domestic subpoena on a nonparty in North Carolina, such as Delta, that commands

the production, inspection, and copying "of designated records, books, papers, documents, electronically stored information, or tangible things in the possession, custody, or control of" the nonparty. N.C. R. Civ. P. 45(a)(1)(b); *see also* N.C. Gen. Stat. § 1F-3. This language, and the scope of permitted discovery, is similar to the terms of discovery permitted between parties under Rule 26. *See* N.C. R. Civ. P. 26(b)(1).

13. A subpoena to a nonparty therefore poses a concrete, one-sided burden with no corresponding benefit. Nonparties, by definition, have no direct stake in litigation. For that reason, "Rule 45 affords greater protection to nonparties than Rule 26 provides to parties." *Bank of Am. Corp. v. SR Int'l Bus. Ins. Co.*, 2006 NCBC LEXIS 17, at *16 (N.C. Super. Ct. Nov. 1, 2006); *accord SciGrip, Inc v. Osae*, 2015 NCBC LEXIS 89, at *14, (N.C. Super. Ct. Sept. 28, 2015). Indeed, "[t]he courts have an *obligation* to protect nonparties from burden and expense imposed without sufficient justification." *Bank of Am. Corp.*, 2006 NCBC LEXIS 17, at *16 (emphasis added).

14. For example, the issuing party must "take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena." *Id.* at *11 (quoting N.C. R. Civ. P. 45(c)(1)). In addition, "[t]he court shall quash or modify the subpoena if" the recipient demonstrates the existence of any enumerated grounds for objection, including privilege, unreasonableness, and undue burden. N.C. R. Civ. P. 45(c)(5); *see also* N.C. R. Civ. P. 45(c)(3); *Bank of Am. Corp.*, 2006 NCBC LEXIS 17, at *11. Where the subpoena requests trade secrets or other confidential information, Rule 45 provides additional safeguards: the court may "quash or modify

the subpoena" unless the issuing party "shows a *substantial need* for the testimony or material that cannot otherwise be met without undue hardship." N.C. R. Civ. P. 45(c)(7) (emphasis added).

15.     Federal courts have also stressed the "distinction between a party and nonparty" in applying the Federal Rules of Civil Procedure. *Beinin v. Ctr. for the Study of Popular Culture*, No. C 06-2298 JW (RS), 2007 U.S. Dist. LEXIS 22518, at *6 (N.D. Cal. Mar. 16, 2007). Although parties to litigation must accept the "travails [of discovery] as a natural concomitant of modern civil litigation," "[n]on-parties have a different set of expectations." *Papst Licensing GmbH & Co. KG v. Apple, Inc.*, No. 6:15-cv-1095, 2017 U.S. Dist. LEXIS 51274, at *9 (N.D. Ill. Apr. 4, 2017). Accordingly, "the fact of nonparty status may be considered by the court in weighing the burdens imposed in the circumstances." *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993); *see also Intermec Techs. Corp. v. Palm, Inc.*, No. C 09-80098 MISC WHA, 2009 U.S. Dist. LEXIS 132759, at *7 (N.D. Cal. May 15, 2009) (holding that protections apply "doubly when the respondent is a non-party").

### B. CyberPower's Motion

16.     CyberPower seeks to compel production of a wide range of communications and technical information, reaching back more than a decade. Delta argues that the requested discovery is "highly confidential, irrelevant to any claim or defense, and unduly burdensome." (Delta Products Corp.'s Opp'n to CyberPower USA's Am. and Restated Mot. to Compel 3 ["Delta Mem."].)

17.     The Court disagrees with Delta that the requested information is irrelevant. The information sought simply needs to be "reasonably calculated to lead to the discovery of admissible evidence." N.C. R. Civ. P. 26(b)(1); *see also Hy-Ko Prods. Co. v. Hillman Grp., Inc.*, No. 5:09-MC-32, 2009 U.S. Dist. LEXIS 94713, at *3 (E.D.N.C. Oct. 8, 2009) (relevance in discovery differs from trial phase). CyberPower requests information concerning the product ARRIS selected to replace CyberPower's allegedly defective power supplies. At a minimum, this information is likely relevant to issues of merchantability and industry standards disputed by ARRIS and CyberPower. Furthermore, the Illinois court implicitly reached this conclusion when it compelled ARRIS to produce documents in response to a substantially similar set of requests. (*See* CyberPower Mem. Ex. 10.) Although that order is not binding for purposes of this ancillary proceeding, it deserves due weight, given the Illinois court's far greater familiarity with the substantive issues in the underlying litigation. Delta's relevance objection is therefore unpersuasive. *See Hy-Ko Prods. Co.*, 2009 U.S. Dist. LEXIS 94713, at *4 ("The burden of showing that the requested discovery is not relevant to the issues in litigation rests on the party resisting discovery.").

18.     Delta's other objections have more merit, particularly given its status as a nonparty. CyberPower's requests vary in scope, and many of them pose distinct and unwarranted burdens on Delta. The Court addresses them in turn.

Agreement Between ARRIS and Delta (RFP No. 1)

19.     In its first request for production, CyberPower seeks a copy of "[t]he agreement between ARRIS and Delta for the sale or supply of Power Supplies or

[battery backup components]." (CyberPower Mem. Ex. 4.) This request does not pose an undue burden to Delta. It is discrete, targeted to a specific written agreement, and does not seek more voluminous or sensitive information associated with the agreement, such as communications regarding negotiations with ARRIS. *See Carter v. Archdale Police Dep't*, No. 1:13CV613, 2014 U.S. Dist. LEXIS 61265, at *12 (M.D.N.C. May 2, 2014) (stating that undue burden factors include "the breadth of the document request" and "the particularity with which the documents are described" (quotation marks omitted)).

20. It is unclear, however, whether any such agreement exists. Though not discussed in Delta's briefing, its counsel represented at the hearing that ARRIS and Delta's relationship is not governed by an agreement responsive to CyberPower's request. Accordingly, to the extent Delta possesses responsive documents that define the terms of the relationship between ARRIS and Delta for the sale of the products in question, it shall produce them, and to the extent there are no such documents, Delta shall certify that they do not exist.

Specifications for Delta's Power Supplies (RFP No. 2)

21. CyberPower's second request for production requests "[a]ll documents constituting specifications for the Power Supplies or [battery backup components]." (CyberPower Mem. Ex. 4.) The request as written is ambiguous because the term "specifications" is not defined. In its briefing, CyberPower clarifies that it seeks two categories of specifications: (1) operating specifications imposed by Verizon and

ARRIS and provided to Delta; and (2) technical specifications created by Delta. (*See* CyberPower USA's Reply in Supp. of Its Mot. to Compel 5.)

22.    The Court agrees that CyberPower is entitled to any specifications that Delta received from Verizon or ARRIS. Although the subpoena includes no relevant time period, the documents were likely provided in 2006 (when both CyberPower and Delta were first creating power supplies) and in 2012 (when ARRIS decided to replace CyberPower's products with Delta's). It would not be unduly burdensome for Delta to identify and produce these specific documents to the extent such documents still exist. And there is no indication in the record that these specifications, which were created by others, include Delta's confidential information.

23.    Delta's own technical specifications are a different matter, and the Court denies CyberPower's request to obtain them. Delta argues, and the Court agrees, that technical specifications of this type are highly confidential and likely the subject of trade secret protection. (*See* Delta's Mem. 9; Chang Aff. ¶ 12.) They are the crown jewels—essentially a blueprint of Delta's power supplies. It would take a strong showing of "substantial need" to warrant compelling a nonparty to provide such information to a direct competitor. N.C. R. Civ. P. 45(c)(7); *see also, e.g.*, *In re Vitamins Antitrust Litig.*, 267 F. Supp. 2d 738, 741–42 (S.D. Ohio 2003); *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985).

24.    CyberPower has made no such showing. CyberPower should have taken all reasonable measures to obtain the discovery it needs before seeking to compel the disclosure of highly confidential information by a nonparty and direct competitor.

Delta argues, for example, that CyberPower could obtain much of the needed information by acquiring and testing ARRIS's current products, which incorporate Delta's power supplies. (*See* Delta Mem. 15.) CyberPower argues that the products are not available, but it is unclear, after full briefing and argument, whether CyberPower has even tried to obtain representative product samples from ARRIS. The Court is not convinced that it did so and, accordingly, finds no substantial need sufficient to warrant production of Delta's product specifications.

25. In addition, CyberPower's request is overbroad. Delta has apparently produced multiple generations of power supplies for ARRIS and Verizon. (*See* Chang Aff. ¶ 5.) Yet CyberPower's request contains no temporal limitation, no model numbers, and no other limitation on the scope of the requested specifications. CyberPower's demand for all specifications for every generation of Delta's power supplies is overbroad.

26. For these reasons, the Court exercises its authority under Rule 45 to modify the subpoena, limiting the request to specifications received by Delta from Verizon or ARRIS. Delta shall produce any such specifications within its possession, custody, or control.

Communications Between Delta and ARRIS or Verizon (RFP Nos. 3-8)

27. CyberPower also requests "[a]ll documents constituting communications" between Delta and ARRIS or Verizon regarding "the actual or anticipated operating conditions for the Power Supplies or [battery backup components]," "testing or analysis of the temperature levels of the Power Supplies or [battery backup

components] and any component parts," and "the expected or actual operating, service or useful life of the Power Supplies or [battery backup components]." (CyberPower Mem. Ex. 4.)

28. These requests, which include no temporal limitation, are facially overbroad. They would require Delta to pore over a decade's worth of communications, not specific to any employee or custodian. According to the affidavit of Delta's Sales Manager Charles Chang, the effort would entail reviewing "millions of communications," requiring "hundreds of hours" and "extensive legal fees." (Chang Aff. ¶ 20.) Delta, as a nonparty, should not be subject to such burdens. *See Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41–42 (1st Cir. 2003) (noting "significant" burden imposed by request for "a decade's worth of materials"); *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004) ("A court may find that a subpoena presents an undue burden when the subpoena is facially overbroad.").

29. Two additional points bear mention. First, it is unclear that these communications would do anything more than amplify the information contained in the specifications that Verizon and ARRIS sent to Delta. CyberPower speculates that the communications would help it better understand any descriptions of anticipated operating conditions provided by Verizon or ARRIS, but this appears to be, at best, an incremental benefit far outweighed by the massive burden imposed on Delta. *See Carter*, 2014 U.S. Dist. LEXIS 61265, at *12 (stating that courts may consider relevance, need, and breadth in determining undue burden).

30.     Second, apart from the burden on Delta, some responsive communications would likely encompass confidential information regarding testing, analysis, and component selection for Delta's products. (*See* Chang Aff. ¶¶ 12–14.) Delta attests that such communications are protected by nondisclosure agreements. (*See* Chang Aff. ¶ 21.) CyberPower has not demonstrated a substantial need for this confidential information at least because it has not shown that it made any effort first to obtain representative products from ARRIS and test them.

31.     The Court denies the Motion as to the third through eighth requests for production.

<u>Documents Related to Power Supplies' Useful Life (RFP No. 9)</u>

32.     Finally, CyberPower's ninth request for production requests "[a]ll documents relating to the determination, calculation or analysis of the operating, service or useful life of the Power Supplies or [battery backup components]." (CyberPower Mem. Ex. 4.) This request appears to be a catch-all, using the broad phrase "relating to." It exhibits no clear scope, has no temporal limitation, is facially overbroad, and would impose an undue burden on Delta. In addition, the responsive information would include the confidential and likely trade-secret information discussed above, for which CyberPower has failed to demonstrate a substantial need. The Court denies the Motion as to the ninth request for production.

III.
CONCLUSION

33.     For all these reasons, the Court **GRANTS in part** and **DENIES in part** the Motion as follows:

a.   Delta shall produce any agreement between ARRIS and Delta responsive to the first request for production that is within its possession, custody, or control. If such an agreement does not exist, Delta shall certify to that effect.

b.   Delta shall produce any specifications that Delta received from Verizon or ARRIS that are responsive to the second request for production and within its possession, custody, or control.

c.   The motion to compel responses to the third through ninth requests for production is denied.

d.   Neither party requested an award of costs incurred in pursuing or defending against the Motion.  The Court determines, in its discretion, that the parties shall bear their own costs.

This the 11th day of July, 2017.


/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases